James P. LEHNERT, Elmer S. Junker, James E. Lindsey, Sam C. Peticolas, John R. Schauble, and Theodore D. Speerman, Plaintiffs,

v.

The FERRIS FACULTY ASSOCIATION–MEA–NEA, Michigan Education Association, National Education Association of the United States, the Board of Control of Ferris State College, S. Eugene Bychinsky, Robert L. Ewigleben, Earl D. Gabriel, Robert P. Gerholz, Fran Harris, Delbert D. Long, Robert C. Redman, Thomas P. Scholler, Patricia M. Short, and Steven L. Thomas, Defendants.

No. G 78–346.

United States District Court, W.D. Michigan, S.D.

Aug. 25, 1986.

See also 556 F.Supp. 316.

Raymond J. LaJeuenesse, Nat. Right to Work Legal Defense Foundation, Springfield, Va., for plaintiffs.

Michael J. Schmedlen, Lansing, Mich., for defendants.

## OPINION

ENSLEN, District Judge.

Plaintiffs bring this action under 42 U.S.C. §§ 1983, 1985, 1986 claiming violations of rights secured to them by the first and fourteenth amendments to the United States Constitution. Jurisdiction is based on 28 U.S.C. §§ 1331 and 1343. Specifically, plaintiffs allege that they are required by state law to pay to the defendant unions an agency shop or service fee in lieu of union dues and that this agency shop fee is not applied by the unions exclusively to purposes germane to their duties as collective bargaining representative for plaintiffs' bargaining unit. Plaintiffs also claim that the procedures implemented by the unions to determine and collect service fees are inadequate. Plaintiffs argue that defendants' practices violate their constitutional rights. Both damages and injunctive relief are sought against the union defendants. However, pursuant to an approved stipulation contained in the Pretrial Order of January 15, 1985, solely injunctive relief is sought against the nonunion defendants. Pretrial Order at 89–90. On the basis of

this stipulation, the nonunion defendants did not participate at trial.

This case was originally filed in this district on May 22, 1978, and was ultimately tried to the bench over 12 trial days in January and April of this year. The court entertained the testimony of 12 witnesses and accepted 90 exhibits into evidence. The parties completed their post-trial briefing on June 6. This opinion is entered pursuant to Fed.R.Civ.P. 52(a).

## I. FINDINGS OF FACT

### A. Stipulated Facts

Plaintiffs James P. Lehnert, Elmer S. Junker, James E. Lindsey and John R. Schauble are tenured members of the faculty of Ferris State College (Ferris). Plaintiffs Theodore D. Speerman and Sam C. Peticolas were tenured members of the Ferris faculty until their respective retirements on November 22, 1978 and May 15, 1982.

Defendant Ferris Faculty Association-MEA-NEA (FFA), an affiliate of the Michigan Education Association (MEA) and the National Education Association (NEA), has served as the exclusive bargaining representative of the faculty of Ferris pursuant to Mich.Comp.Laws § 423.211 at all times pertinent to this case. Pursuant to the unified membership concept, membership in the FFA also constitutes membership in the MEA and NEA. The MEA is a Michigan corporation; the NEA is incorporated under a special act of the United States Congress.

Defendant Board of Control of Ferris State College is a public body corporate established and existing under the constitution and laws of the State of Michigan. Mich. Const. art. VIII, § 6; Mich.Comp. Laws § 390.801 et seq. It is empowered to control and manage Ferris.[1] In addition to the Board of Control, other nonunion defendants are the individual members of the Board of Control and the President and Vice-President for Business Affairs of Ferris, in their official capacities.

Since on or about February 22, 1975, the FFA and Ferris have entered into successive collective bargaining agreements containing agency shop provisions.[2] After the FFA and Ferris entered into their first agency shop agreement, the authorizing statute, Mich.Comp.Laws § 423.210, was challenged in the Michigan courts and eventually appealed to the United States Supreme Court. In Abood v. Detroit Board of Education, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), the Court upheld the constitutionality of the statute and outlined the permissible uses of agency shop fees in public employee unions. The concept of the current agency shop provision was proposed thereafter by Ferris during factfinding upon the advice of its counsel and with the intent of complying with Abood.[3] There are three principal differ-

---

1. Ferris is an agency and arm of the State of Michigan, established by the state's constitution and required to be funded by the state. Mich. Const. art. VIII, § 4.

2. The original agency shop provision was included in the labor contract pursuant to the authority of 1973 Mich.Pub. Acts 25, § 1, codified at Mich.Comp.Laws § 423.210. This early provision stated that all members of the bargaining unit not belonging to the FFA were required to pay agency shop fees equivalent to union dues. The provision also authorized the President of the college, acting as the agent of the Board of Control, to discharge any member of the bargaining unit who failed to comply.

3. Section 2.6 of union defendants' exhibit I is the agency shop provision of the collective bargaining agreement between Ferris and the FFA for 1981–1984. That section provides, in pertinent part:

> A. Each employee covered by the negotiated Agreement between the Board of Control of Ferris State College and the Ferris Faculty Association (Dated November 19, 1981) shall, as a condition of employment, on or before thirty-one (31) days from the date of commencement of professional duties or July 1, 1981, whichever is later, join the Ferris Faculty Association or pay a *service fee to the Association equivalent to the amount of dues uniformly required of members of the Ferris Faculty Association, less any amounts not permitted by law;* provided, however, that the bargaining unit member may authorize payroll deduction for such fee. *In the event that a bargaining unit member shall not pay such service fee directly to the Association or authorize payment through payroll deduction, the*

ences between the early agency shop provisions and those in effect since November 19, 1981. The first difference is that under the present provision, Ferris does not discharge nonunion members for failure to pay the service fee. Rather, as authorized by Mich.Comp.Laws § 408.477, Ferris will now deduct the appropriate service fee from the paycheck of the dissenting member of the bargaining unit after due notice and opportunity to comply. The second distinction of the modern agency shop provision is that the service fees are now computed as the equivalent to the amount of the dues required of FFA members, "less any amounts not permitted by law." The third and final major change is that dissenting members of the bargaining unit may now "object to the use of the service fee for matters not permitted by law" by utilizing the procedure "officially adopted by the Association."

Pursuant to stipulations and orders entered on April 21, 1983, and October 22, 1984, to avoid litigation expense and time, defendant unions have refunded, or agreed to refund, with simple interest, all service fees paid by plaintiffs, and waived any

*College shall, at the request of the Association, deduct the service fee from the bargaining unit member's salary and remit the same to the Association under the procedure provided below.*

B. The procedure in all cases of non-payment of the service fee shall be as follows:

1. The Association shall notify the bargaining unit member of non-compliance by certified mail, return receipt requested, explaining that he or she is delinquent in not tendering the service fee, specifying the current amount of the delinquency, and warning him or her that unless the delinquent service fees are paid or a properly executed deduction form is tendered within fourteen (14) days, he or she shall be reported to the College and a deduction of service fee shall be made from his or her salary.

2. If the bargaining unit member fails to comply, the Association shall give a copy of the letter sent to the delinquent bargaining unit member and the following written notice to the College at the end of the fourteen (14) day period:

The Association certifies that (name) has failed to tender the periodic service fee required as a condition of employment under the 1981–84 Faculty Agreement and demands that under the terms of this Agreement, the College shall deduct the delinquent service fees from the collective bargaining unit member's salary. The Association certifies that the amount of the service fee includes only those items authorized by law.

3. The College upon receipt of said notice and request for deduction, shall act pursuant to Section A above. In the event of compliance at any time prior to deduction, the request for deduction will be withdrawn. The Association, in enforcing this provision, agrees not to discriminate between bargaining unit members.

C. With respect to all sums deducted by the College pursuant to this Article, The College agrees promptly to disburse said sums directly to the Association.

D. Bargaining unit members paying the service fee provided for herein or whose service fees have been deducted by the College from their salaries may object to the use of their service fee for matters not permitted by law. *The procedure for making such objections is that officially adopted by the Association.* A copy of the Association policy will be provided by the Association upon a request of a bargaining unit member.

. . . .

F. This Article shall be effective for each academic year of this Agreement and all sums payable hereunder shall be determined from the beginning of each academic year. Persons becoming members of the collective bargaining unit during the course of an academic year shall have their service fee prorated over the academic year.

. . . .

I. The Association will certify at least annually to the College, fifteen (15) days prior to the date of the first payroll deduction for professional fees or service fees, the amount of said professional fees and the amount of the service fee to be deducted by the College, and that said service fee includes only those amounts permitted by the Agreement and by law.

J. Should the provisions of 2.6, Agency Shop, be found contrary to law as a result of a final decision from which no appeal is processed, and which is binding on the parties to this Agreement, the parties agree to meet on written request of either party to negotiate to bring Section 2.6 into compliance with any such final decision, such negotiations to be limited to the provisions of Section 2.6 and will not affect the terms and conditions of this Agreement which shall remain in full effect for the life of this Agreement. [Emphasis added.]

The agency shop provision of the 1984–1987 collective bargaining agreement between Ferris and the FFA is identical in all respects to its immediate predecessor.

claims they might have had against plaintiffs for service fees not paid, for periods prior to the 1981–1982 fiscal year (September 1, 1981 to August 31, 1982). Pursuant to the stipulation and order entered April 21, 1983, plaintiffs have deposited with the registry of the court the MEA's and FFA's portions of the service fees demanded for the 1981–1982 and 1982–1983 academic and fiscal years; plaintiffs still in the bargaining unit are obligated during the pendency of this litigation to similarly deposit subsequent service fees after notice of the MEA and FFA portions; and defendant unions are enjoined from otherwise enforcing the agency shop agreement against plaintiffs during the pendency of this litigation. The amounts deposited with the court are: James P. Lehnert, Elmer S. Junker, James E. Lindsey and John R. Schauble, $455.00 each; Sam C. Peticolas, $215.00. No subsequent deposits have been made because the FFA has not given notice to plaintiffs of the appropriate amounts.

Also to avoid expense and time, the parties have further agreed that the issue of which union expenditures constitutionally are chargeable to plaintiffs shall be tried only with regard to fiscal year 1981–1982. However, the proportions of the expenditures of defendant unions for various purposes during that year shall not be treated as representative of the proportions of their expenditures during subsequent fiscal years. During the 1981–1982 academic and fiscal year there were an average of approximately 502 full-time equivalent employees, including five of the plaintiffs, in the bargaining unit represented by the FFA.

In practice, the amount of the service fee certified to Ferris by the FFA (in cases where service fee payors have not asserted constitutional objections) has been equivalent to the amount of dues required of members of the FFA. Of course, under the agreement of April 25, 1979, mentioned above, plaintiffs have paid reduced service fees into an interest-bearing escrow account and no payroll deductions from their salaries have been made by Ferris since that time. Pursuant to and in furtherance

of the governance documents of the FFA, MEA and the NEA, a substantial portion of the service fees collected from nonunion members of the bargaining unit has been and will continue to be transmitted by the FFA to the MEA and the NEA. In fiscal year 1981–1982 an individual's total dues (or service fee in the case of a nonmember not asserting a timely constitutional objection) amount of $284.00 was disbursed as follows: FFA, $24.80; MEA, $211.20; and NEA, $48.00.

In fiscal year 1981–1982, $10.00 of the MEA's portion of the service fee was placed in a Teacher Assistance Program (TAP) Fund. A major purpose of this TAP Fund was to provide direct financial assistance to teachers who were out of work permanently or temporarily as a result of a strike. After the decision in *Male v. Grand Rapids Education Ass'n*, 98 Mich. App. 742, 295 N.W.2d 918 (1980), *app. denied*, 412 Mich. 851 (1981), became final, the MEA acknowledged that the $10.00 portion of the service fee allocable to the TAP Fund would additionally be considered nonchargeable for objecting nonunion employees. Union defendants' exhibit G additionally renders nonchargeable a portion of MEA staff time spent administering the TAP Fund.

Plaintiffs are not and have not been members of the FFA. Both before and after filing the instant action, and in their complaint itself, they notified the FFA, MEA and NEA of their objection to the use, even temporarily, of any portion of their service fees for purposes other than negotiating a collective bargaining agreement with the Board of Control, administering that agreement, and adjusting grievances arising under it. The MEA and NEA have spent and will continue to spend portions of service fee monies to support activities other than negotiating a collective bargaining agreement with the Board of Control, administering that contract and adjusting grievances arising under it. Although the parties agree that collective bargaining, contract administration and grievance adjustment occurring at bargaining units other than Ferris can affect col-

lective bargaining, contract administration and grievance adjustment occurring at Ferris, the parties disagree as to whether the plaintiffs constitutionally may be required to support such activities occurring other than at Ferris.

The MEA and NEA have adopted procedures by which dissenting service fee payers, such as plaintiffs, may register their protest against the use of their money for certain purposes. The MEA Policy and Procedures Regarding Objections to Political-Ideological Expenditures, as revised by the MEA Board of Directors on August 6, 1982, is union defendants' exhibit J.[4] The NEA's Political Activity Rebate Procedure,

---

4. This procedure is central to the issues of this case and will be quoted in full:

### POLICY REGARDING OBJECTIONS TO POLITICAL–IDEOLOGICAL EXPENDITURES

Upon timely objection, no individual required to pay a service fee to a legal association affiliated with the Michigan Education Association (MEA) shall be required, through payment of such a fee, to contribute to the financial support of an ideological cause or political activity unrelated to collective bargaining, contract administration, grievance adjustment and employee representation, which he/she opposes. An individual who, in compliance with the administrative procedures established by the Executive Director of the Michigan Education Association (Executive Director), objects to the use of a portion of his/her service fee to support such an ideological cause or political activity shall be entitled to pay a reduced fee based upon the Executive Director's determination of the percentage of the MEA's annual budget spent for ideological or political purposes unrelated to collective bargaining, contract administration[,] grievance adjustment and employee representation.

### OBJECTIONS TO POLITICAL–IDEOLOGICAL EXPENDITURES
### ADMINISTRATIVE PROCEDURES
Section I

Objections under the policy regarding Objections to Political-Ideological Expenditures ("the policy") shall be made by giving written notice to the Executive Director of the Michigan Education Association. Notice shall be given in writing during the period of September 1 through the 15th of each year and shall specify those causes, programs and activities to which the individual objects, or that the individual objects to the use of a portion of her/his service fee for any political activity or or ideological cause unrelated to collective bargaining, contract administration, grievance adjustment and employee administration. An objection must be renewed each fiscal year (September 1 to August 31).

Upon receipt of the objection, the Executive Director (or her/his delegate) shall determine first whether the cause, program, or activity to which the individual objects is in fact an ideological cause or political activity within the meaning of the policy. An ideological cause or political activity within the meaning of the policy is one which is unrelated to organizing, collective bargaining, contract administration, grievance adjustment or employee representative [sic]. Second, the Executive Director or her/his delegate, if she/he determines that in fact the cause, program or activity to which the individual objects is an ideological cause or political activity, shall determine the pro rata amount of the individual service fee that has been expended upon or will be expended upon such cause, activity or program. If the individual has objected to a portion of her/his service fee for any political activity or ideological cause, as defined herein, the Executive Director or her/his delegate shall determine (1) the pro rata amount of the individual service fee that has been expended or will be expended on all such causes or activities and (2) the reduced fee accordingly required to be paid by the individual. Upon written request, the Executive Director or her/his delegate shall provide to the individual a copy of the approved budget for the year in question.

Section II

An individual dissatisfied with the determination of the Executive Director may appeal that determination to the Executive Committee of the Board of Directors of the Michigan Education Association. An appeal to the Executive Committee may be taken within 30 days of receipt of the determination of the Executive Director. The appeal shall be taken by giving a written notice to the Executive Director of the individual's desire to appeal her/his determination to the Board of Directors. The individual, along with her/his notice of appeal, may submit to the Executive Committee such written statements and other evidence in support of her/his position as she/he deems necessary. The Executive Committee shall reach a decision on the appeal as soon as practicable, preferably within 60 days from receipt of the appeal. If the individual is dissatisfied with the decision of the Executive Committee, she/he may further appeal by commencing, or otherwise being bound by, appropriate proceedings in the Michigan Employment Relations Commission.

Section III

These procedures apply to amounts remitted to the Michigan Education Association as well as amounts retained by the local associations affiliated with the Michigan Education

as last amended by the NEA Executive Committee on March 27, 1979, is plaintiffs' exhibit 1.[5]

The fiscal year 1981–1982 expenditures of the FFA from dues and service fee monies are set forth in Appendix A. Although the parties disagree as to the chargeability of many of the activities upon which the FFA, MEA and NEA expend service fee monies, they do agree on the general proposition that administrative or overhead expenses should be allocated proportionally between expenses (not including administrative or overhead expenses) found by the court to be chargeable and those found not chargeable. The expenses of the MEA Building and Site Fund during fiscal year 1981–1982 are to be treated as overhead expenses.

## B. Adjudicated Facts

### 1. Ferris Faculty Association–MEA–NEA

In the Fall of 1981, at the beginning of the 1981–1982 fiscal year, the FFA was engaged in the process of negotiating a new collective bargaining agreement with Ferris. Negotiations did not go smoothly and, as reflected in plaintiffs' exhibit 33, a letter from the President of the FFA to the President of the MEA dated October 8, 1981, the FFA was considering going out on strike. In response to this situation, the MEA conducted a "job action investigation" at Ferris.

Warren D. Culver, who in 1981–1982 was the statewide Director of the MEA's Uni-Serv division, testified that the term "job action" is synonomous with "strike" and that the purpose of a job action investigation is to appraise the status of the ongoing negotiations, to determine the willingness of the local's membership to support a strike if necessary, and to put pressure on the employer by making outward preparations for a possible strike. The effectiveness of this third function as a bargaining tool is evidenced by Mr. Culver's testimony that only one out of every seven or eight job action investigations actually culminate in a strike. The remaining six or seven troublesome negotiations are resolved at the bargaining table short of a strike. The court finds Mr. Culver's testimony on this point to be credible.

In conjunction with the job action investigation undertaken at Ferris in the fall of 1981 the FFA, in conjunction with the MEA, established what the union defendants designate a "crisis center;" plaintiffs call it a "strike headquarters." Once again

Association. The local associations shall reimburse the Michigan Education Association for any amounts rebated on its behalf under the policy.

5. The NEA has adopted a procedure that is somewhat more complex than that implemented by the MEA. Initially, within 30 days after the NEA budget for a fiscal year is finalized, the Executive Director of the NEA computes a "preliminary political activity rebate" percentage which equals that percentage of NEA dues allocated for "political activity," as that term is defined in Section I.H. of the Exhibit. Copies of the NEA's political activity rebate procedure are posted by all NEA affiliates (i.e., FFA) and published annually in the NEA *Reporter* to give notice to nonmembers. Dissenting nonmembers of the NEA who make a timely objection to the use of any portion of their service fees for "political activity" are notified that the above mentioned percentage of their service fee has been placed in escrow and that the political activity rebate to which he or she is ultimately entitled will be sent to him or her not more than 30 days after the close of the fiscal year in question. The final political activity rebate percentage is computed by the Executive Director by applying the same analysis as above to the actual NEA expenditures for the past fiscal year. Included in the final political activity rebate sent to the dissenting nonmember is an explanation for any differences between the preliminary and final rebate figures, and an explanation of the steps to be taken to challenge the final determination.

Pursuant to the NEA procedure, appeal of the Executive Director's final determination is first taken to the NEA Executive Committee. That decision may be challenged by filing for binding neutral arbitration in Washington, D.C. The expenses of this arbitration are paid by the NEA. The arbitrator must adhere to the NEA's definition of "political activity" and may increase but not decrease the final rebate percentage. Alternatively, Section VII.E. of exhibit 1 provides that the dissenting service fee payor may challenge both the NEA rebate and the state affiliate's (e.g., MEA's) rebate under the appeal procedure adopted by the state affiliate.

referring to the credible testimony of Mr. Culver, the court finds that whatever label is attached to this facility, prior to a strike it serves as a meeting place for the local's membership, a base from which tactical activities such as informational picketing can be conducted, and serves to apply additional pressure on the employer by suggesting, whether true or not, that the local is prepared to strike if necessary. While the parties stipulated at the trial that the FFA did not engage in a strike in 1981–1982, Appendix A establishes that the FFA did expend a total of $3821.04 on the crisis center/strike headquarters. Appendix A also reflects that a total of $832.96 was spent for informational picketing, media exposure, signs, posters and buttons. In the negotiations period, these expenses are incurred for the purpose of informing the public of the issues involved in an attempt to bring public pressure to bear on the employer. This type of public opinion and support is very important during contract negotiations involving public sector labor unions such as the FFA given the nature of the employment and the funding available to the college.

The court also finds that $4788.77 was expended by the FFA during 1981–1982 on collective bargaining, contract ratification, negotiations training, and arbitration. Another $150 was spent for rent to hold membership meetings. A total of $1026.84 was used to send FFA representatives to the MEA and NEA Representative Assemblies. The FFA also spent $666.42 on the 13E Coordinating Council. That council is the UniServ unit for the separate bargaining units at Ferris State College and Central Michigan University.

In terms of FFA expenses for 1981–1982 related to political activities, Appendix A reveals that $149.99 was spent on the Preserve Public Education (PPE) Conference. There was much testimony given and many exhibits received regarding the nature of the PPE program in 1981–1982. The court finds that this program was best summed up in the credible testimony of Warren Culver:

The "Preserve Public Education Program" was an attempt on the part of the [MEA] to develop meaningful coalitions in the various communities so that we could pass millages, fight ballot issues, and do the kind of things that are absolutely necessary to fund public education, so that we have some reason to be able to continue to exist, bargain the contracts, and gain some benefit for our members.

. . . .

. . . I think that one of the most important things that has to be understood about public employee bargaining is that the amount of money that we get comes from either local property taxes, state taxes and some federal tax. And if we have no way of raising that money, which is all allocated through the legislative process or an election, then we have no way to bargain.

So it is really the front line bargaining of our contracts.

Transcript of Culver Testimony at 4–5. Further, a total of $102.69 was expended for the purposes of lobbying the state legislature and attending an MEA Legislative Dinner. However, no attempt was made to identify the specific issues on which the FFA was lobbying with respect to these expenditures.

Finally, Appendix A states that $2500 was loaned by the FFA to another association in 1981–1982. At trial, it was stipulated that this was a no-interest loan made to the MEA local in the Hisperia School District to support it in a strike. It was further stipulated that this loan was repaid in full the following fiscal year. The remainder of the expenses of the FFA during 1981–1982 were administrative in nature.

### 2. Michigan Education Association

The MEA is a labor organization which, through 800–900 local affiliates such as the FFA, represents public school employees throughout Michigan. Like most public sector labor unions, it is a highly politicized organization, active in causes both related and unrelated to collective bargaining, con-

tract administration and grievance adjustment. Prior to August 1981, the MEA had been divided into eight divisions. Four of these divisions were administrative in nature: General, Human Resources, Finance, and Internal Operations. The remaining four divisions were UniServ, Public Affairs, Professional Development and Human Rights (PDHR), and Program Development and Support.

The UniServ division was the MEA's main line of contact with the local affiliates. It also accounted for approximately 60% of the MEA's total budget. Basically, UniServ directors (of which there were 97 in 1981–1982) were responsible for delivering the full range of MEA services to the members of the local units. It appears from all the testimony received that these directors spent the majority of their time on activities directly related to collective bargaining, contract administration and grievance adjustment. Further, the UniServ division included the Legal Services program. Through this program, the local associations were provided with legal representation on all employment-related matters. This service was provided on an "as needed" basis by private law firms and in-house counsel. UniServ also employed three negotiations specialists and two organizing specialists who were all supervised by the Director of Organizing and Negotiations.

The Public Affairs division was responsible for the lobbying activities of the MEA and for a majority of its communications and public relations activities. The MEA's lobbying activities traditionally cover a broad spectrum of issues ranging from pursuing state and local aid for public education to supporting the Equal Rights Amendment. Much of this political activity was undertaken to insure that the state's public schools were adequately funded and the union's members would be able to negotiate beneficial contracts. Of course, any legislative activity in the area of Michigan's Public Employment Relations Act, which affects the MEA's ability to engage in collective bargaining, was closely monitored. Public Affairs also kept abreast of changes in federal laws and regulations which would impact on collective bargaining, contract administration and employee representation. In addition, the *Teacher's Voice*, the primary publication of the MEA reporting on all activities of the organization, was published by this division and distributed to all members of affiliated bargaining units. Finally, the Public Affairs division administered the association's political action committee—MEA–PAC.

The PDHR division engaged four of its eleven professional staffers as research consultants. These research consultants collected data on school finance, collective bargaining and other areas related to public school employment. They then prepared a negotiations data book used by the UniServ staff in bargaining contracts and maintained comprehensive statistics on contract settlements throughout the state. The research consultants also prepared prepackaged surveys for the local associations to use in polling their members to determine the members' interests and concerns going into negotiations. These surveys often concerned the comparability of terms and conditions of employment in surrounding or similar schools. This type of information is highly relevant to the development of bargaining demands. Research services were available to the locals on an as needed basis. In addition to the research consultants, the division also employed seven PDHR consultants. These consultants engaged in three primary areas: professional development (including instruction, curriculum development and staff development), leadership training, and human rights.

The Program Development and Support division was primarily concerned with conventions and internal governance. The division's budget included the salaries of the MEA Division Directors, the Executive Director, the President and Vice-President, and the administrative assistants to these individuals.

In August 1981, the MEA Board of Directors approved a reorganization of the

association's internal structure. That reorganization was completed by the end of the 1981–1982 fiscal year and resulted in the reduction of the number of budget divisions from eight to five. The reorganized budget still had a General category and four main institutional divisions. Uniserv remained the largest single division in the MEA although its size was reduced slightly and some of its smaller departments were transferred. Three new divisions were created: Administrative, Program Services, and Corporate Affairs.

The Administrative division had three primary program areas: the Department of Finance and Membership, the Department of Internal Operations, and the Department of Human Resources. The Program Services division began the 1981–1982 fiscal year with five departments: Government Affairs, Legal Services, PDHR, Organizing and Bargaining, and Membership Services. However, the Board of Directors eliminated Organizing and Bargaining as a separate department during that year; it is unclear whether those functions were then performed by some other department within Program Services or another division. Finally, the Corporate Affairs division was engaged in developing and delivering special services to the membership. Included in this division were the following: the Michigan Educators Financial Services Association (MEFSA) (providing individual economic benefits and financial services to members), the Michigan Education Association Legal Services Plan (MEALS) (providing free legal services for members), and the Michigan Education Special Services Association (MESSA) (providing various insurance benefits for members).

Considerable testimony was offered concerning the financial and accounting systems utilized by the MEA. Most of this testimony revolved around the bi-annual budget. In the spring of 1980, a budget was approved by the MEA Representative Assembly covering fiscal years 1980–1981

and 1981–1982. However, as a result of a decline in MEA membership, a revised budget for the 1981–1982 fiscal year was developed by the Board of Directors and approved by the fall 1981 Representative Assembly. This revised budget is Union defendants' exhibit A. According to the testimony of Catherine Anderson, Director of Finance at the Michigan Education Data Network Association (MEDNA), a reorganized budget was subsequently prepared for 1981–1982 to reflect the administrative reorganization of the MEA during that year.

With respect to the MEA's revised 1981–1982 budget, the four divisions of an administrative nature had individual budgets of the following amounts: General, $425,629; Human Resources, $255,041; Finance, $632,400; Internal Operations, $1,257,300. In addition, the Building and Site Fund, which the parties stipulated would be treated as an administrative or overhead expense, was budgeted at $494,000 for that year. This results in a total budgeted administrative or overhead expense of $3,064,370. The remaining four divisions responsible for direct (as opposed to administrative) expenses had the following individual budgets: Program Development and Support, 1,551,300; UniServ, 11,453,700; Public Affairs and Communications, 1,373,200; and Professional Development and Human Rights, 973,600. Therefore, direct budgeted expenditures for 1981–1982 were $15,351,800, and the overall MEA revised budget for that year was $18,416,170.[6]

When the MEA prepared its reduced fee calculations for 1981–1982, it acknowledged that most of its employees engaged in some activity that was arguably nonchargeable. Therefore, the association had its division and department directors estimate the approximate percentage of time that the average person in his or her area historically spent on nonchargeable activity. These time estimates were generally made after consultation with legal counsel,

---

**6.** This figure excludes the MEA–PAC and TAP Fund which the Union defendants concede are

completely nonchargeable.

but rarely involved the review of contemporaneous hard data. Indeed, witness after witness testified that it was not and had not been the practice of MEA staffers to record the nature of their daily activities on time sheets. After these estimates of the percentage of nonchargeable time were prepared, a "cushion" was added to increase the effective nonchargeable percentage to cover any error. The final nonchargeable percentage was then applied to the annual dues of MEA members which were computed on the basis of the 1981–1982 revised budget. The results of this calculation are set forth in union defendants' exhibit G. Catherine Anderson testified that the MEA's records for 1981–1982 are insufficient to enable an independent certified public accountant to conduct an audit of union defendants' exhibits G and OOOO. Transcript of Anderson Testimony at 33–34.

At trial, the MEA continued to argue the validity of its final reduced fee calculation by presenting evidence regarding the estimated nonchargeable portion of its 1981–1982 revised budget. Although evidence of actual expenditures for that year, as opposed to budget figures, should have been available to the MEA, the only such evidence that was introduced was the schedule of expenses contained on the last page of plaintiffs' exhibit 613. Moreover, this schedule of expenses was formatted not on the revised budget for that year but on the *reorganized* budget.

Ms. Anderson also testified that actual total expenditures for any given year generally vary less than 2% from the total budgeted amount. However, she conceded that individual line items may vary by more than 2%. The court finds that Ms. Anderson's concession is an understatement. By reference to the actual versus budgeted

figures for 1978–1979 and 1981–1982 listed in union defendants' exhibit A and plaintiffs' exhibit 613 respectively, it is clear that individual line items often vary considerably more than 2%.

The court was not at all aided in its calculation of a chargeable reduced service fee by evidence of estimated nonchargeable percentages of time and activity. Further, aside from the fact that exhibit 613 contains sparse detail of activity expenditures, the difference in the structures between union defendants' exhibits A and G (based on the revised budget) and plaintiffs' exhibit 613 (based on the reorganized budget) made an extrapolation of a reasonably accurate chargeable service fee impossible. For these reasons, I conclude that there are few instances indeed in which the MEA has established the chargeability of discrete actual expenditures.

The procedure by which the MEA implemented the service fee for nonunion objectors in 1981–1982 is set forth at note 4, *supra*. Recently, in the wake of the United States Supreme Court's Opinion in *Chicago Teachers Union v. Hudson*, — U.S. —, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), a new policy and procedure regarding objections to the service fee was implemented. On May 7, the MEA Board of Directors adopted a new policy regarding objections to political-ideological expenditures. Shortly before that, the Executive Director of the MEA adopted, upon the advice and recommendation of the Director of Legal Services, new administrative procedures to implement this policy. The new policy and procedures are currently in effect and are contained in union defendants' exhibit QQQQ. Due to their importance to the ultimate remedy in this case, they are also set forth in full in the margin.[7]

**7. POLICY REGARDING OBJECTIONS TO POLITICAL–IDEOLOGICAL EXPENDITURES**

Upon timely objection, no individual required to pay a service fee to a local association affiliated with the Michigan Education Association (MEA) shall be required, through the payment of such a fee, to contribute to the financial support of an ideological cause or political activity unrelated to collective bar-

gaining, contract administration, grievance adjustment and employee representation, which he/she opposes. An Individual who, in compliance with the administrative procedures established by the Executive Director of the Michigan Education Association (Executive Director), objects to the use of a portion of his/her service fee to support such an ideological cause or political activity shall be

### 3. National Education Association

The NEA is a national voluntary labor organization of public school employees. The MEA is a state affiliate and the FFA is a local affiliate of the NEA. Through its various state and local affiliates, the NEA represents approximately 12,000 bargaining units nationwide. Like the MEA, the NEA is a highly politicized organization which engages in a variety of activities aimed primarily at promoting public education and public school employee welfare, in addition to improving the bargaining ability and position of its members and affiliates. The NEA is governed by the National Education Association Representative Assembly, Board of Directors and Executive Committee. Its actual expenses for 1981–1982 totaled $70,420,142.

At the outset, the court will make some findings regarding plaintiffs' claim that the NEA has waived its right to any and all service fees from these individual plaintiffs. It appears that in 1981, the NEA made some settlement offers to plaintiffs whereby the NEA would refund service fees collected and waive its right to some future fees in an attempt to avoid the prohibitively high expense of the instant litigation. Plaintiff Speerman, who had already retired at that time, accepted the NEA's offer of refund but the remaining plaintiffs did not. The parties could not agree on exactly what future fees were subject to the waiver and the settlement and release of the NEA did not transpire. Furthermore, plaintiffs were unwilling to forego their claim against the NEA for injunctive relief regarding its rebate procedures. In 1982, the court denied defendants' motion to dismiss for mootness on similar grounds. *Lehnert v. Ferris Faculty Ass'n–MEA–NEA*, 556 F.Supp. 309 (W.D.Mich.1982). Finally, on October 22, 1984, the plaintiffs

required to pay a reduced fee based upon a determination of the percentage of the MEA's annual budgeted expenditures necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees.

OBJECTIONS TO POLITICAL–IDEOLOGICAL EXPENDITURES
ADMINISTRATIVE PROCEDURES

Section I

At the beginning of each fiscal year (September 1 to August 31), the Executive Director of the Michigan Education Association or his/her designee shall determine the amount of the MEA's total budgeted expenditures that will be expended on chargeable and nonchargeable activities. The Executive Director or his/her designee shall then calculate the reduced fee that an objector will be required to pay. By November 10 of each year, or as soon thereafter as possible, the Executive Director shall make available to all non-union employees information identifying the MEA's total budgeted expenditures and identifying the chargeable and nonchargeable budgeted expenditures. At the same time, the Executive Director shall make available information identifying the previous year's total budgeted expenditures, the year-end financial statements verifying the actual expenditures, and an analysis of the previous year's reduced fee calculation using the verified actual expenditures.

Section II

Objections under the policy regarding Objections to Political-Ideological Expenditures ("the policy") shall be made by giving written notice to the Executive Director of the Michigan Education Association. Notice shall be given in writing during the period of September 1 through December 1 of each year and shall specify that the individual rejects the reduced fee calculation. An objection must be renewed each fiscal year.

Upon receipt of the written notice rejecting the reduced fee calculation, the Executive Director (or his/her designee) shall review the reasons, if any are given, for the rejection. The Executive Director will have 10 days to respond to the objector. If the Executive Director does not respond within the 10-day period it will be assumed that no merit was found in the individual's objection and the objector may proceed to the next step of this procedure.

Section III

An individual dissatisfied with the determination of the Executive Director shall appeal that determination by filing an Unfair Labor Practice Charge, or otherwise being bound by, appropriate proceedings in the Michigan Employment Relations Commission. If an unfair labor practice charge has not been filed by December 15, the union shall seek a reasonably prompt determination of the appropriate reduced fee by the Michigan Employment Relations Commission.

Section IV

Pending a decision of the Michigan Employment Relations Commission, the objector may be required to pay 100% of the reduced fee into an escrow account identified by the Executive Director.

and the NEA stipulated that the NEA would refund all pre–1981–1982 service fees in exchange for limited discovery and litigation solely as to the 1981–1982 school year. The court finds that this stipulation would have been meaningless had the parties thought that the NEA had waived its right to all service fees. Since plaintiffs offer no other evidence suggesting that the NEA has made such a waiver, the court expressly finds that the NEA has not waived its right to collect service fees from plaintiffs for any fiscal years from 1981–1982 forward.

From the evidence received at trial, the court finds that the NEA can be broken down functionally into 12 areas. Eight of those areas involve so-called direct expenditures: Affiliate Services, Communications, Government Relations, Human and Civil Rights, Instruction and Professional Development, Legal Services, Political Affairs, and Research. The remaining four areas, Administration, Business and Finance, Data Processing, and Governance, can be characterized as administrative or overhead. A brief description of the role of those areas and their actual expenditures in 1981–1982 is taken from union defendants' exhibits EEEE, FFFF and GGGG.

The Affiliate Services area operates to deliver NEA programs to NEA affiliates in the field. This is accomplished through six NEA Regional Offices. The total 1981–1982 Affiliate Services expenditures of $27,498,475 are further broken down into the following eight general areas: membership promotion and recruitment, $2,042,482; leadership training, $1,177,354; staff training, $1,010,138; coordination of services to affiliates, $3,529,672; bargaining and negotiation support, $1,171,938; field support for legislation and political affairs, $778,-792; organizing, $4,615,088; and UniServ, $13,173,011.

The mission of the Communications area is to provide internal and external communications to NEA leaders, members, potential members and the general public. Internal communication was effected primarily through the NEA's various publications.

External communication was accomplished through the media. The Communications area expended a total of $7,904,237 in 1981–1982, $5,846,892 internally and $2,057,344 externally.

Through the Government Relations area in 1981–1982, the NEA lobbied Congress on various issues related to employment and public education, monitored the activities of the Reagan Administration and several federal agencies, coordinated its efforts regarding passage of the Equal Rights Amendment, and communicated pertinent information to the state and local affiliates. The Governmental Relations area spent $1,652,718 on its attempts to achieve federal legislation and $433,435 on monitoring the administration and agencies for a total of $2,086,153.

The Human and Civil Rights area is sometimes referred to as Teacher Rights. The area is responsible for developing and implementing programs to prevent violations of teachers' rights, to protect and defend teachers whose rights have been violated, and to increase the involvement of minorities and women in the NEA. In 1981–1982, the area expended $255,751 on programs and litigation to protect teacher rights, $649,692 to enhance civil rights in education, $474,797 to increase minority involvement, and $234,232 to enhance equal educational opportunity, for a total of $1,614,472.

The Instruction and Professional Development (IPD) area is responsible for assisting affiliates with the development and application of guidelines for licensure, accreditation and continuing education for teachers. It also provides training to teachers in numerous areas of professional and educational interest. With respect to higher education, it assists faculty in implementing guidelines to evaluate governance, tenure and academic freedom. The area's total 1981–1982 expenditures of $2,275,960 were divided as follows: professional excellence, $514,054; organizational excellence through IPD, $856,534; integrity in educational opportunities, $546,743; and national recognition for quality education,

teaching and critical educational issues, $358,629.

The Legal Services area offers a variety of programs and activities designed to assist and protect members and affiliates in all types of legal matters. The area operates a unified legal services program, a subsistence loan program, offers liability insurance and assists states in establishing attorney referral programs. Total area expenditures for 1981–1982 were $7,174,718.

The Political Affairs area concentrates primarily on administering NEA–PAC and fostering individual involvement in campaigning and electoral politics. The area spent a total of $1,081,629 in 1981–1982. The NEA has agreed that this figure is nonchargeable.

The final area involving "direct" expenditures is Research. This area is responsible for gathering and analyzing data, developing and conducting surveys, providing consultant and technical services, and training affiliated staff and elected leaders. In 1981–1982, the Research area expended $1,377,730 on the research computer network, $284,814 on collective bargaining/benefits services, $320,771 on information services, $1,024,908 on surveys, and $548,695 on studies/special projects, for a total of $3,556,918.

The four areas responsible for administrative and overhead expenses, Administration, Business and Finance, Data Processing, and Governance, had total 1981–1982 expenditures of $17,227,585. Of particular note was the $1,408,670 spent by Gover-

nance on the 1982 NEA Representative Assembly.

As union defendants' exhibit L reflects, the NEA also computed its 1981–1982 political activity rebate by having its departmental area directors estimate the approximate percentage of time that staffers in their area spent on nonchargeable activity. Although certain NEA employees do keep daily time sheets of their activities, it is unclear to what extent this data was reviewed in making the nonchargeable estimates. Further, to a greater degree than the MEA, the NEA introduced into evidence data regarding actual expenditures for the fiscal year 1981–1982, as opposed to a mere budget. *See* union defendants' exhibits EEEE (financial statement as of August 31, 1982 with auditor's report) and GGGG (1981–1982 program accomplishment report). While the program accomplishment report is the type of hard data necessary in litigation such as this to establish chargeable expenditures, very little relevant interpretive testimony was offered to clarify the individual line items.

## II. ANALYSIS AND LEGAL CONCLUSIONS

### A. *Chargeable Expenditures*

#### 1. *Applicable Law*

In 1973, the Michigan legislature amended its Public Employment Relations Act (PERA) to expressly authorize an agency shop system for union representation of public employees.[8] The constitutionality of

---

8. In that regard, Mich.Comp.Laws § 423.210 now provides in pertinent part:

(1) It shall be unlawful for a public employer or an officer or agent of a public employer (a) to interfere with, restrain or coerce public employees in the exercise of their rights guaranteed in section 9 [§ 423.209]; (b) to initiate, create, dominate, contribute to, or interfere with the formation or administration of any labor organization: Provided, That a public employer shall not be prohibited from permitting employees to confer with it during working hours without loss of time or pay; (c) to discriminate in regard to hire, terms or other conditions of employment in order to encourage or discourage membership in a labor or-

ganization: *Provided further, That nothing in this act or any law of this state shall preclude a public employer from making an agreement with an exclusive bargaining representative as defined in section 11 [§ 423.211] to require as a condition of employment that all employees in the bargaining unit pay to the exclusive bargaining representative a service fee equivalent to the amount of dues uniformly required of members of the exclusive bargaining representative....*

(2) It is the purpose of this amendatory act to reaffirm the continuing public policy of this state that the stability and effectiveness of labor relations in the public sector require, if such requirement is negotiated with the public employer, that all employees in the bar-

the amended Act was challenged in the Michigan courts and ultimately appealed to the United States Supreme Court. In *Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), the Court held that an agency shop clause in a collective bargaining agreement between the Board of Education and the Detroit Federation of Teachers did not violate the first and fourteenth amendment rights of freedom of expression and association of nonunion members of the bargaining unit who were required to pay service fees, at least insofar as the service fees were used to finance union expenditures for the purposes of "collective bargaining, contract administration, and grievance adjustment." *Id.* at 225–26, 97 S.Ct. at 1794. The Court also indicated that a service fee payor could not be required to fund union expenditures for political activity or ideological causes not germane to the union's duties as collective bargaining representative. *Id.* at 235–36, 97 S.Ct. at 1799–1800.

The *Abood* decision was not the first time that the Supreme Court had the opportunity to pass on the constitutional implications of union security provisions such as the agency shop. In *Railway Employees' Dept. v. Hanson*, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed.2d 1112 (1956), the Court held that section 2, Eleventh, of the Railway Labor Act (RLA) as amended, 45 U.S.C. § 152, Eleventh, which authorized railway carriers and labor organizations acting as exclusive representatives of bargaining units to enter into union shop agreements,[9] did not violate the first and fifth amendments to the Constitution. The Court acknowledged the congressional intent of eliminating the free rider problem by requiring those who enjoy the benefits

of union representation to contribute to the support of the union. 351 U.S. at 231, 76 S.Ct. at 717. Further, the Court stated that such congressional action was a valid exercise of power under the commerce clause given the legitimate governmental interest in industrial peace and stabilized labor-management relations. *Id.* at 233–34, 76 S.Ct. at 718–19.

One question left undecided by the *Hanson* Court—whether the required payment of union dues in a union shop could be used to force support of ideological causes or political candidates, *see id.* at 238, 76 S.Ct. at 721—was decided several years later in *International Association of Machinists v. Street*, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961). *Street* also involved a union shop under section 2, Eleventh of the RLA. In that case, the union had expended union funds, over the objection of dissenting union members, in the support of political causes to which plaintiff-dissenters were opposed. The Court held that the union's use of an employee's money, over his objection, "to support candidates for public office, and advance political programs, is not a use which helps defray the expenses of the negotiation or administration of collective agreements, or the expenses entailed in the adjustment of grievances and disputes." *Id.* at 768, 81 S.Ct. at 1800. Construing the RLA in such a way as to avoid constitutional issues, the Court held that the statute did not give the union this power. *Id.* at 768–69, 81 S.Ct. at 1799–1800.

A third case concerning the RLA, *Brotherhood of Railway Clerks v. Allen*, 373 U.S. 113, 83 S.Ct. 1158, 10 L.Ed.2d 235 (1963), described the burden of persuasion

gaining unit shall share fairly in the financial support of their exclusive bargaining representative by paying to the exclusive bargaining representative a service fee which may be equivalent to the amount of dues uniformly *required of members of the exclusive bargaining representative*. [Emphasis added.]

**9.** A union shop arrangement, as opposed to an agency shop, allows the employer to hire freely but all employees must join the union within a specified period of time. *See generally Develop-*

*ments in the Law—Public Employment*, 97 Harv. L.Rev. 1611, 1726 n. 1 (1984) [hereinafter cited as *Developments* ]. Nevertheless, under federal law, a union shop is the practical equivalent of an agency shop because the requirement of union membership is interpreted as the requirement of payment of fees and dues. *Abood,* 431 U.S. at 217 n. 10, 97 S.Ct. at 1790 n. 10 (citing *NLRB v. General Motors,* 373 U.S. 734, 742, 83 S.Ct. 1453, 1459, 10 L.Ed.2d 670 (1963)).

in cases where objecting nonmembers challenge the chargeable service fee:

> Since the unions possess the facts and records from which the proportion of [nonchargeable] political to total union expenditures can reasonably be calculated, basic considerations of fairness compel that they, not the individual employees, bear the burden of proving such proportion. Absolute precision in the calculation of such proportion is not, of course, to be expected or required; we are mindful of the difficult accounting problems that may arise. And no decree would be proper which appeared likely to infringe the unions' right to expend uniform exactions under the union-shop agreement in support of activities germane to collective bargaining and, as well, to expend nondissenters' such exactions in support of [nonchargeable] political activities.

*Id.* at 122, 83 S.Ct. at 1163–64. This language was quoted with approval in *Abood,* 431 U.S. at 239 n. 40, 97 S.Ct. at 1802 n. 40.

Subsequent to *Abood,* the Supreme Court decided yet another case involving section 2, Eleventh of the RLA. In *Ellis v. Brotherhood of Railway Clerks,* 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984), the Court went beyond *Hanson, Street, Allen* and *Abood* and actually undertook to define the line between chargeable and nonchargeable union expenditures under the RLA. Applying the test of "whether the challenged expenditures are necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues" *id.* at 448, 104 S.Ct. at 1892, the Court addressed six particular types of union expenditures: conventions, social activities, publications, organizing, litigation, and death benefits. In making this inquiry, however, the Court first construed the applicable provisions of the RLA in an attempt to avoid unnecessary constitutional issues. *See id.* at 444–45, 104 S.Ct. at 1890–91.

With respect to the first two categories of union expenditures, conventions and social activities, the Court held that the RLA allowed the expenditures to be charged to objecting service fee payors. The Court stated that periodic, national union conventions at which union officers are elected and overall union policies, including bargaining goals and priorities, are set, are necessary for the union to "maintain its corporate and associational existence." *Id.* at 448, 104 S.Ct. at 1892. For this reason, the Court held that conventions are necessary in order that the union may carry out its statutory function as exclusive representative, and therefore, the entire cost of such conventions are chargeable under the RLA. *Id.* at 448–49, 104 S.Ct. at 1892–93. As to the .7% of total union expenditures spent on social activities, the Court noted that these functions were formally open to nonmember employees and were otherwise important to the membership because they helped maintain "harmonious working relationships." *Id.* at 449, 104 S.Ct. at 1892–93. Although conceding that social expenditures were not central to the union's statutory function, the Court refused to hold that such *de minimus* expenditures were beyond the scope of the RLA. *Id.* at 449–50, 104 S.Ct. at 1893.

The Court also considered a portion of the amount of money expended by the union on publications sent to all employees—members and nonmembers alike—to be chargeable to objecting nonmembers. Such publications, the Court observed, are the union's primary means of reporting on its activities and communicating with represented employees on issues of mutual concern. The Court held that the cost of such publications is chargeable under the RLA to the proportional extent that the publications report on chargeable activities. *Id.* at 450–51, 104 S.Ct. at 1893–94. Presumably, this calculation should be made on a column inch basis, *see id.* at 450, 104 S.Ct. at 1893; but absolute precision in the calculation is not required. *Allen,* 373 U.S. at 122, 83 S.Ct. at 1163.

Since the Court found that these three expenditures were chargeable under the

RLA, it also had to consider whether charging for the same activities increased the degree of infringement of the first amendment rights of the objecting employees beyond that impingement inherent in the union shop and, if so, whether the additional infringement is adequately justified by the governmental interest in labor peace. As to the expenditures for social activities, the Court held that the only communicative aspect of the compelled subsidy was the fact that such activities were sponsored by the union—a fact that was already taken into consideration in allowing the union shop. Therefore, forcing the nonmember to subsidize such social activities in no way increased the degree of infringement of first amendment rights. *Id.* 466 U.S. at 456, 104 S.Ct. at 1896.

The Court recognized that conventions and publications presented more serious questions of communicative content. However, the small additional infringement of first amendment rights was justified by the legitimate governmental interest. The Court added that "[t]he very nature of the free-rider problem and the governmental interest in overcoming it require that the union have a certain flexibility in the use of compelled funds. 'The furtherance of the common cause leaves some leeway for the leadership of the group.'" *Id.* (quoting *Abood*, 431 U.S. at 222–223, 97 S.Ct. at 1793).

There was no explanation for the discrepancy in holdings that the union could charge for the entire cost of conventions under the statute and the first amendment, but only for the portion of union publications relating to chargeable activities. It is beyond peradventure that aspects of union conventions are devoted to activities considered nonchargeable under the Court's definition. Nevertheless, Justice Powell's separate Opinion clearly pointed out this anomaly so it cannot be argued that the Court's holding regarding the expenses of the convention was anything less than deliberate. *See id.* at 457, 104 S.Ct. at 1897 (Powell, J., dissenting in part).

The Court held that the union's expenditures for organizing efforts were completely nonchargeable under the RLA. Although organizing efforts outside the bargaining unit arguably are undertaken to make the union stronger and to bolster its bargaining ability, the connection between such efforts and collective bargaining was thought to be too tenuous. *Id.* at 451, 104 S.Ct. at 1893. With respect to intra-unit organizing, the Court stated flatly that "it would be perverse to read [the RLA] as allowing the union to charge to objecting nonmembers part of the costs of attempting to convince them to become members." *Id.* at 452 n. 13, 104 S.Ct. at 1894 n. 13.

In addressing the union's expenses related to litigation, the Court construed the RLA to impose two qualifiers on chargeability. First, it held that only litigation before agencies and in courts that "concerns bargaining unit employees and is normally conducted by the exclusive representative" is chargeable. *Id.* at 453, 104 S.Ct. at 1895. This includes, but is not limited to, litigation incident to bargaining, contract administration, grievance and dispute resolution, fair representation matters and inter-union jurisdictional disputes. The second qualifier to chargeability under the statute is that litigation expenses must be broken down on a unit-by-unit basis. *Id.* This latter requirement is unique to litigation expenditures in the *Ellis* Opinion. Indeed, the requirement of a unit-by-unit breakdown of chargeable expenditures has never, to my knowledge, even been suggested in any of the Supreme Court's prior (or subsequent) union/agency shop decisions. Nevertheless, the Court offered no explanation of why the RLA required such a cost allocation and no rationale of why this type of allocation was appropriate to litigation expenses and no others.

With respect to the issue of the union's payment of death benefits to designated beneficiaries of deceased employees, the court of appeals in *Ellis* had held that since insurance benefits are a mandatory subject of bargaining, the union's decision to insure its own members rather than seek benefits from the employer was a legit-

imate tactical decision, "germane to the work of the union within the realm of collective bargaining." 685 F.2d 1065, 1074 (9th Cir.1982). The Supreme Court did not reach the issue because, at the time of the Opinion, the union was no longer the exclusive representative of the unit and the objecting nonmembers were no longer participating in the benefit system. The Court did, however, rule that the objecting nonmembers were not equitably entitled to a refund of their past contributions because they had enjoyed the benefit of insurance coverage. *Id.* at 454–55, 104 S.Ct. at 1895–96.

At least with regard to political or ideological expenditures of the union, there is a fundamental distinction between cases like *Hanson, Street, Allen* and *Ellis* involving private sector employment, and those like *Abood* and the case at bar involving public sector employment. The *Abood* Court recognized that this distinction is not to be found in the nature of the employee or in the work performed, but rather in the character of the employer. 431 U.S. at 229–30, 97 S.Ct. at 1796–97 (citing Summers, *Public Sector Bargaining: Problems of Governmental Decisionmaking*, 44 U.Cin.L.Rev. 669, 670 (1975)). While *Street* and *Allen* appear to have settled the question whether political or ideological expenditures by the union can ever be chargeable to an objecting member of a private sector bargaining unit, the same reasoning does not necessarily apply in the public sector where the legislature and other political bodies are integrally involved in the collective bargaining process or otherwise directly impact on the terms and conditions of employment. *See Developments, supra* note 9, at 1732–33. The *Abood* Court did not rule on this point, but it nevertheless framed the issues:

There will, of course, be difficult problems in drawing lines between collective-bargaining activities, for which contributions may be compelled, and ideological activities unrelated to collective bargaining, for which such compulsion is prohibited. The Court held in *Street*, as a matter of statutory construction, that a

similar line must be drawn under the Railway Labor Act, but in the public sector the line may be somewhat hazier. The process of establishing a written collective-bargaining agreement prescribing the terms and conditions of public employment may require not merely concord at the bargaining table, but subsequent approval by other public authorities; related budgetary and appropriations decisions might be seen as an integral part of the bargaining process.

431 U.S. at 236, 97 S.Ct. at 1800 (footnote omitted).

The leading post-*Abood* federal case on political expenditures by public sector unions is *Robinson v. New Jersey*, 741 F.2d 598 (3d Cir.1984), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1228, 84 L.Ed.2d 366 (1985). In that case, public employee plaintiffs challenged, *inter alia*, portions of the New Jersey Employer-Employee Relations Act, N.J.S.A. 34:13A–5.1 *et seq.*, which allowed agency shop arrangements and authorized the use of service fees for support of certain lobbying activities directly related to collective bargaining, contract administration or the terms and conditions of employment, but not partisan political activities or ideological causes only incidentally related to such functions. *Id.* 34:13A–5.5(b) and (c). Plaintiffs argued that such forced political support violated the first and fourteenth amendments. After a thorough discussion of the Supreme Court's RLA cases and the *Abood* decision, concentrating on the distinctive nature of public sector employment relations, the *Robinson* court concluded:

So long as the lobbying activities are pertinent to the duties of the union as a bargaining representative and are not used to advance the political and ideological positions of the union, lobbying has no different constitutional implication from any other form of union activity that may be financed with representation fees.

741 F.2d at 609. *See also Cumero v. Public Employment Relations Board*, 167 Cal. App.3d 131, 145–46, 213 Cal.Rptr. 326, 336–

37 (1985); *cf. Beck v. Communications Workers of America*, 776 F.2d 1187, 1210–11 & n. 31 (4th Cir.1985) (lobbying expenditures not chargeable in private sector union context).

Although the Third Circuit's decision in *Robinson* is not controlling in the instant case, I find the reasoning in that opinion very persuasive. Further, although the New Jersey statute at issue in *Robinson* provided explicitly that certain lobbying expenditures were chargeable by the union, and Michigan's PERA is silent on this issue, I do not think that the two statutes can fairly be distinguished in this respect. It appears that the New Jersey and Michigan legislatures had similar intents when passing their respective amendatory statutes—to foster the roles of exclusive representatives in the public employment sector and to promote labor peace by eliminating, to the greatest extent possible, the problem of "free riders" in the collective bargaining unit. *Compare Robinson*, 741 F.2d at 609–10 *with* Mich.Comp. Laws § 423.210(2) *and Abood*, 431 U.S. at 224, 97 S.Ct. at 1793 (discussing PERA). Unlike PERA, the New Jersey statute was amended after, and with the benefit of, the Supreme Court's decision in *Abood*. If there is a distinction to be made between the two statutes, it is that PERA sought to make the full equivalent of ordinary union dues chargeable to the service fee payor while the New Jersey statute provided that the service fee could not exceed 85% of ordinary dues. *See* N.J.S.A. 34:13A–5.5(b). Therefore, it cannot be argued that the Michigan legislature did not intend for service fee payors in an agency shop to contribute to the cost of the union's lobbying activities to the extent that the activities are germane to the union's duties as bargaining representative and the compelled contribution is otherwise constitutionally permissible. In accordance with the foregoing discussion, I find that such lobbying expenditures are constitutionally chargeable to public sector service fee payors under PERA.

Another issue in contention is public sector organizing. As I have already discussed, the Supreme Court held in *Ellis* that expenditures related to organizing, both in and out of the bargaining unit, are nonchargeable under the RLA. The union defendants in the case at bar seek to distinguish *Ellis* on three grounds. First, they restate the importance of the distinction between public and private unions, and especially the inability of school employee unions in Michigan to engage in a lawful strike. These defendants argue that the relative strength of a public bargaining unit in this case is more directly connected to their ability to collectively bargain than in the *Ellis*, private sector union context because the threat of an illegal strike will be taken more seriously by the governmental employer if it knows that a greater percentage of the employees will support the strike. Secondly, the union defendants argue that the majority of the organizing conducted by them in 1981–1982 was aimed at school support personnel—not teachers. In other words, the unions were organizing within the bargaining unit but not attempting to convince objecting nonmember teachers, such as the instant plaintiffs, to become members. *Cf. Ellis*, 466 U.S. at 451–52 & n. 13, 104 S.Ct. at 1893–94 & n. 13. Lastly, the union defendants distinguish the *Ellis* decision on this point because the Court's holding with respect to organizing was made under the RLA, not under the Constitution.

While these defendants' arguments regarding the differences between the organizing undertaken in the case at bar and that considered in *Ellis* are not entirely unpersuasive, this court is not convinced that the differences are so compelling as to justify a contrary conclusion. The *Ellis* Court stated, in unambiguous language, that it considered organizing efforts "aimed toward a stronger union" to have only an "attenuated connection with collective bargaining." *Id.* at 451, 104 S.Ct. at 1894. This court is satisfied that the constitutional standard of *Abood* requires a more direct connection. Accordingly, I hold that the union defendants' expendi-

tures for organizing are not chargeable to the plaintiffs.

■ The final issue in contention is litigation expenses. As I have already stated, the *Ellis* Court construed the RLA in such a way as to require such expenses to be chargeable to service fee payors only where the litigation was related to the union's duties as exclusive representative *and* where it involved members of the service fee payors' bargaining unit. I fully recognize that the *Ellis* Court engaged in statutory interpretation in an effort to avoid the constitutional issue. By contrast, the constitutional question of the chargeability of public sector litigation expenses is squarely before this court. Though *Ellis* is not binding on this issue, the Supreme Court's statutory rationale ordinarily would be accorded the greatest persuasive weight in analyzing the constitutional requirements. However, I am deeply troubled by the complete lack of rationale offered for the *Ellis* requirement of a unit-by-unit breakdown. I am also very concerned about the adverse implications of according constitutional significance to this particular statutory requirement and applying the new rule to the facts of the instant case.

The inconsistency of requiring only litigation expenses to be broken down by bargaining unit in determining chargeability is readily apparent. Much if not all litigation that is related to the union's duties as exclusive representative addresses issues of shared concern. *See Developments, supra* note 9, at 1731. Furthermore, since unions operate on a cost-sharing basis, extraordinary expenses incurred by any one unit in any given year are spread out over all units represented by the union. This cooperative cross-funding enables the union to effectively represent individual members and units in hard cases that will have an impact on the greater whole while maintaining stable dues levels. Since dues levels are incorporated as benchmarks for service fees in union/agency shop statutes, *see, e.g.,* 45 U.S.C. § 152, Eleventh; Mich. Comp.Laws § 423.210; N.J.S.A. 34:13A–5.-5(b), service fees may not exceed ordinary union dues even in a situation where a disproportionately high percentage of the union's litigation expenditures for a given period are directly attributable to a particular bargaining unit. In other words, a unit-by-unit breakdown of litigation expenses, or any other expenditure, in a determination of the chargeable service fee—even assuming such a breakdown were possible or practicable from a cost effectiveness standpoint—would *logically* lead to drastic fluctuations in the amount of the service fee charged to the objecting nonmembers of individual units. Nevertheless, because most union/agency shop statutes tie the amount of the service fee to the amount of ordinary union dues, service fees can never legally exceed dues. Therefore, a unit-by-unit breakdown of chargeable expenditures would only exacerbate the free rider problem and thereby frustrate the governmental interest that the Court has repeatedly recognized lies at the heart of statutes authorizing union/agency shops.

In addition to these general legal problems, imposing a constitutional requirement of a unit-by-unit breakdown of litigation (or any other) expenses would create an unreasonable and unmanageable administrative burden on the instant union defendants. The MEA has hundreds of affiliated local bargaining units; the NEA has thousands. Assuming *arguendo* that these bodies were able to breakout discrete expenses by bargaining unit—an assumption that is not warranted by the facts at trial—I have little doubt that the marginal revenue received from service fee payors would not justify the cost of modifying the existing accounting systems to accommodate the requirement. Thus, from a cost-benefit standpoint, a decree requiring a unit-by-unit breakdown of chargeable litigation expenses would be "likely to infringe the union's right to expend *uniform exactions* under the [agency] shop agreement in support of activities germane to collective bargaining...." *Allen,* 373 U.S. at 122, 83 S.Ct. at 1164 (*cited in Abood,* 431 U.S. at 239 n. 40, 97 S.Ct. at 1802 n. 40.) In my opinion, such an extreme decree is not warranted by the Constitution

or by logic under the facts of the case at bar.

### 2. Analysis

(a) Ferris Faculty Association–MEA–NEA

In reference to the stipulated 1981–1982 expenditures of the FFA listed in Appendix A, I conclude that the bargaining related expenses, the expenses associated with contract ratification and the negotiations training workshop, and arbitration fees, totalling $4,788.77, are unquestionably chargeable to plaintiffs. I similarly find that the $1,026.84 expended on the MEA and NEA Representative Assemblies is fully chargeable under *Ellis*. Plaintiffs seek to distinguish the *Ellis* decision on this point because the instant conventions were those of "affiliated" unions and not the actual exclusive bargaining representative. However, the legal relationship between local bargaining unit representatives such as the FFA and their state and national affiliates such as the MEA and NEA is a matter of statutory interpretation. The Michigan Employment Relations Commission (MERC), the state administrative agency with the primary responsibility for contruing the requirements of PERA, has repeatedly found that "an affiliated bargaining unit is a different entity from a local, independent unit." *In re Bridgeport Spaulding Community Schools*, Nos. C79–J–353 & CU79 J–51, slip op. at 34 (A.L.J. Op. Feb. 24, 1986) (citing cases). Furthermore, the MERC Administrative Law Judge in *Bridgeport Spaulding* explicitly held that since the "union as affiliated is the exclusive representative" under PERA, the objecting service fee payor can be charged for the cost of the MEA and NEA Representative Assemblies under *Ellis. Id.* at 40. By the same rationale, the $666.42 spent by the FFA in sending representatives to the 13E coordinating council, where bargaining strategies and representational policies are developed for the UniServ unit composed of the Ferris State College and Central Michigan University bargaining units, is chargeable to plaintiffs.

The FFA lobbying expenditures were divided into three categories. I found that the PPE program was directed at securing funding for public education in Michigan. In a public sector bargaining unit where funding for employment positions, salaries and benefits is conditioned upon legislative appropriations, such lobbying is directly related to the statutory duties of the exclusive representative. *See Abood, supra; Robinson, supra.* Therefore, the $149.99 spent on the PPE Conference is chargeable to plaintiffs. As to the $102.69 expended by the FFA on lobbying the state legislature and the MEA Legislative Dinner, the union defendants failed to meet their burden of establishing that the nature of the issues concerned were chargeable. While I do not doubt that funding and other chargeable issues were at least partially covered in these two expenditures, the unions have conceded that they also engaged in other ideological lobbying that is not so clearly chargeable under the *Abood/Robinson* rationale. Since the burden remains always with the union defendant to establish chargeability, I must conclude that none of the $102.69 spent on unexplained lobbying is chargeable to the plaintiffs.

 With respect to the expenditures related to the contract negotiations difficulties encountered in 1981–1982, including those for the "crisis center/strike headquarters," informational picketing, advertising, and rent for membership meetings, I think the fact that the FFA did not engage in an illegal strike is of paramount importance. The question whether any of these expenditures may have been chargeable had a strike occurred is one that this court need not address. The "crisis center" never became a "strike headquarters" but still served a useful purpose in the negotiations process. The rent paid to hold membership meetings was necessary to keep the employees of the bargaining unit apprised of the progress of the negotiations and to get feedback on the members' demands. Likewise, the expenditures for disbursing information to the public that was favorable to the bargaining unit's position is well within

the realm of reasonable and legal bargaining tactics in the public sector labor context. Therefore, I hold that the entire $4,804.00 expended by the FFA for these purposes is chargeable to the plaintiffs.

The final direct expenditure made by the FFA during 1981–1982 was the $2,500.00 no-interest loan made to support an affiliated local bargaining unit in a strike. The parties have stipulated that this loan was repaid in full in a subsequent fiscal year. I conclude that inasmuch as strikes by public employees are illegal under Michigan law, this expenditure was made in support of an illegal activity, and hence, cannot be charged to the objecting nonmembers of the bargaining unit. I note only as an aside that had the loan proceeds been recouped during the 1981–1982 fiscal year and then re-expended on a chargeable activity, a different issue would have been presented. Since that is not the case, however, I will leave that issue for another court and another day.

In accordance with this discussion, I find that the FFA has established that 81% of its direct expenditures for 1981–1982 are chargeable to the plaintiffs. Pursuant to the aforementioned stipulation, that same percentage will be applied to the local's administrative expenses. In computing the chargeable service fee for the FFA for that year, the ordinary union member's dues amount, $24.80, is multiplied by the percentage of the total expenditures that are considered chargeable, in this case 81%. The resulting service fee to which the FFA is entitled from the plaintiffs for 1981–1982 is $20.09.

#### (b) Michigan Education Association

The MEA's theory of this case was that it could establish its chargeable service fee by identifying estimated percentages of time spent on admittedly nonchargeable activity, subtracting the resulting percentage from the overall budgeted expenditures for the year in question, and considering the remaining portion budgeted expenditures chargeable to the plaintiffs. The presentation of evidence at trial by the MEA was consistent with this theory. However, after reviewing the applicable Supreme Court decisions on point, I conclude that the evidentiary record created by the MEA in its case in chief is deficient in two respects.

■ As an initial proposition, it is no longer open to question that in establishing a service fee a union must identify the expenditures that it made in relation to activities that are germane to duties as exclusive representative. *See Chicago Teachers Union v. Hudson*, —— U.S. ——, 106 S.Ct. 1066, 89 L.Ed.2d 232, 247 (1986). The percentage of the overall union expenditures that the union establishes as chargeable is thus determined and that same percentage is applied to the amount of ordinary union dues, resulting in a constitutionally chargeable service fee.

It is not a truism, as the union defendants would suggest, that an admission of nonchargeable activity and time estimates is, by implication, competent proof of chargeable activity and time. As the *Hudson* Opinion explained, the first amendment requires that the union adequately disclose the nature of the activities for which it seeks to charge the objecting service fee payor. Since the burden of persuasion on the issue of the percentage of chargeable expenditures remains always with the union, and since the union possesses the facts and records from which this percentage is to be calculated, *see Allen*, 373 U.S. at 122, 83 S.Ct. at 1163, the union cannot shift the burden to the plaintiffs to cull through the unidentified but assumed chargeable activities in search of discrepancies. This type of erroneous burden shifting is not only unfair to service fee payors who object on the grounds of legitimate first amendment rights but also inevitably leads to the unmanageable and unnecessary pretrial discovery and attendant trial difficulties experienced by the parties and the court in the instant case.

■ The second deficiency in the evidentiary record created by the MEA regarding its service fee for 1981–1982 was with the basis for their calculations. As I have already described, the MEA relied primarily

on "budgeted" figures instead of evidence of actual "expenditures." The Supreme Court has consistently held, at least since the 1963 *Allen* decision, that it is union expenditures that are in issue. While *Allen* also stated that "absolute precision in the calculation is not, of course, to be expected or required," *id.*, and that admonition has been continually observed, *see Hudson*, 106 S.Ct. at 1076 n. 18, 89 L.Ed.2d at 247 n. 18, the question remains what degree of inaccuracy is tolerable. Under the particular circumstances of this case, I hold that the introduction of budgeted expenditures is not competent proof of actual expenditures.

Although this case was tried in 1986, the proofs at trial related exclusively to the 1981–1982 fiscal year. Therefore, this is not a situation in which the union was prevented by time constraints from marshalling its financial data regarding expenditures. To the extent that the union's then-existing accounting system did not enable it to breakdown chargeable from nonchargeable expenditures, it might still have identified major categories of chargeable expenditures with reasonable precision. By relying primarily on budgeted expenditures, which often vary considerably from actual expenditures when individual line items are compared, the court would be forced to speculate as to the accuracy of individual line items in the hopes that variables would average out in the end. This problem is, of course, exacerbated by the previously described differing budget formats between union defendants' exhibits A and G (based on revised budget) and plaintiffs' exhibit 613 (based on reorganized budget). Such speculation by the court, acting as the finder of fact, is impermissible. While a limited degree of imprecision is tolerable in calculating a service fee, the reliance on budgeted as opposed to actual expenditures under the circumstances of the instant case is too imprecise.

■ In reference to the actual expenditures set forth in the MEA's schedule of expenses for 1981–1982, exhibit 613, I find very few items which I can categorize as completely chargeable absent further relevant explanation. Two such expenses are the $212,959 for the MEA Representative Assembly and the $118,216 for the NEA Convention. Both expenditures were incurred by the Program Development and Support division which is classified as a "direct expenditure" division. Both are clearly, chargeable to plaintiffs under *Ellis*.

■ The MEA's Program Services division, also a "direct expenditure" division, expended a total of $254,092 on the union's primary publication available to all bargaining unit members—the *Teachers' Voice*. Under *Ellis*, this expense is chargeable to the same extent that the publication reports on activity that is chargeable. All issues of Volume 59 of the *Teacher's Voice* for 1981–1982 were admitted into evidence. *See* plaintiffs' composite exhibit 612. Furthermore, plaintiffs' introduced a "marked copy" of a content analysis study which describes the nature of the contents of Volume 59 on a column inch basis. *See* plaintiffs' exhibit 594. I have reviewed both exhibits exhaustively and while I find the format and mathematical computations of exhibit 594 helpful, I have made an independent determination of the chargeable content of exhibit 612. My analysis reveals that 81.6% of Volume 59 of the *Teacher's Voice* relates to chargeable activity (see Appendix B for calculation). Therefore, of the $254,092 expended in 1981–1982 on that publication, 81.6% or $207,339.07 is chargeable to plaintiffs.

Due to the paucity of relevant evidence, I am unable to identify with any acceptable degree of accuracy any further discrete chargeable expenditures of the MEA for 1981–1982. I hasten to add that this should not be taken as an indication that the MEA did not engage in significant activity of a chargeable nature. This holding merely reflects my understanding of the current status of the law in this area and the union's failure to structure its proofs in accord with that law.

The sum of the three chargeable MEA expenditures identified above is $538,-

514.07. The total 1981–1982 MEA expenditures for the three "direct expenditure" divisions under the reorganized budget—Program Development and Support, UniServ, and Program Services—was $15,766,674. Therefore, considering the stipulation regarding direct and administrative expenditures, the proven chargeable percentage is 3.4%. The reduced service fee chargeable to plaintiffs in the instant case and for the 1981–1982 fiscal year is 3.4% of the ordinary MEA dues of $211.20, or $7.18.

### (c) National Education Association

Like the MEA, the evidentiary presentation of the NEA was geared toward estimating the percentage of nonchargeable time and activities of NEA staffers. In contrast to the MEA, however, at least two exhibits were introduced which described in some detail the actual expenditures of the NEA for 1981–1982, *see* union defendants' exhibit EEEE and GGGG, the latter of which breaks down expenditures by programs or activities performed by the various departments or areas. Thus, while the court's calculation of the NEA's chargeable service fee is not aided by most of the testimony of NEA witnesses or by union defendants' exhibit L, which is a memorandum explaining the NEA's political activity rebate procedure and a compilation of memoranda from the various departmental areas estimating the nonchargeable percentages of time and activity, some discrete program expenditures are described in exhibit GGGG.

Due to the acknowledged partially ideological-political mission of the NEA, the vast majority of the identified program expenditures detailed in GGGG were either for a mix of chargeable and nonchargeable activity or were not sufficiently explained to determine their nature. Since there was very little testimony from NEA witnesses relating directly to this exhibit, the court has no clear way to break-out the chargeable from the nonchargeable in these mixed or ambiguous expenditures. Nevertheless, there are a few detailed expenditures that are exclusively for chargeable activity.

With respect to these particular expenditures identified below, I hold that defendant NEA met its burden of persuasion that the program activity expenditure was properly chargeable.

Under the Affiliate Services area of exhibit GGGG, pp. 6–7, function 5.0 is entitled "Bargaining and Negotiation Support." Bargaining and negotiation expenses are the most easily identified chargeable amounts under any service fee standard. By reference to the columns for program description, "Program Accomplishment" and "Summary," it is clear to me that programs numbered 5.1, 5.2 and 5.3 identify chargeable activities. The total NEA expenditures for these three programs was $785,190. I do not consider the expenditure for program number 5.4 to be chargeable because it was partially in relation to job action situations. As I explained earlier in this opinion, whether certain expenditures for job actions are to be considered chargeable is a determination to be made on the basis of the particular fact situations. Since the total expenditures for program 5.4 was not sufficiently detailed by the NEA, I cannot consider any portion of it chargeable.

Under the Research area, pp. 39–41 of exhibit GGGG, function 2.0 is entitled "Collective Bargaining/Benefits Services." Again by reference to the first three columns, it is clear that programs 2.1, 2.2, 2.3, 2.4, 2.5 and 2.6 identify chargeable activities. Therefore, the entire $284,814 expended on this function is proportionately chargeable to plaintiffs. Also under the Research area, pp. 43–44, function 5.0 is entitled "Studies/Special Projects." Programs numbered 5.1 and 5.2 relate directly to studies of public school financing, an activity area that this court considers chargeable. Therefore, the $395,801 expended on these two programs in 1981–1982 is proportionately chargeable to plaintiffs.

This short list exhausts the program expenditures in the eight so-called "direct expenditure" departmental areas of the NEA that this court can identify from the face of

exhibit GGGG, other relevant exhibits and the sparse relevant testimony, as related exclusively to union activities that are clearly chargeable. The subtotal of the described chargeable program activity expenditures by "direct expenditure" areas is $1,465,805. This figure represents 2.75% of the total expenditure of $53,192,624 by the "direct expenditure" areas. While there are other program activities in the four "administrative expenditure" areas of Administration, Business and Finance, Data Processing, and Governance (*e.g.*, Administration program 1.5, and Governance function 1.0), the parties have stipulated to apply the same percentage of chargeable "direct" expenditures in determining the chargeable percentage for "administrative" expenditures.

In accordance with this discussion, I hold that the NEA has only established that 2.75% of its overall expenditures for 1981–1982 is proportionately chargeable to the plaintiffs. The NEA service fee that plaintiffs are required to pay for that year is 2.75% of the ordinary NEA dues of $48, or $1.32.

## B. *Constitutionally Required Procedure*

### 1. *Applicable Law*

Until relatively recently, the law concerning the procedures to be used by unions in determining service fees in an agency or union shop was in a constant state of flux. The procedural problem is of fundamental importance because of the strong but conflicting public and private interests involved. "[T]he objective must be to devise a way of preventing compulsory subsidization of ideological activity by employees who object thereto without restricting the Union's ability to require every employee to contribute to the cost of collective bargaining activities." *Abood*, 431 U.S. at 237, 97 S.Ct. at 1800.

In the early union shop decisions interpreting the requirements of the RLA, the Supreme Court focused on the duty of the dissenting member to object to political uses of his monies and speculated as to appropriate remedies for proven violations.

In *Street*, the Court indicated that "dissent is not to be presumed," and at least implied that an objector would have to specify which specific political activities or causes he or she objected to. 367 U.S. at 774–75, 81 S.Ct. at 1802–03. The *Street* Opinion also suggested that an appropriate remedy might be an order to the union to rebate portions of service fees improperly collected and expended. *Id.* at 775, 81 S.Ct. at 1803. However, the Court made clear that since the objecting employees' "grievance stems from the spending of their funds for purposes not authorized by the Act in the face of their objection, not from the enforcement of the union shop agreement by the mere collection of funds," an injunction relieving objectors of all money due under the union shop agreement was inappropriate. *Id.* at 771, 81 S.Ct. at 1801.

Two Terms later in *Allen*, the Court clarified its intent that objectors need only state their objection to the expenditure of their service fees for *any* political purpose; "[i]t would be impractical to require a dissenting employee to allege and prove each distinct union political expenditure to which he objects." 373 U.S. at 118, 83 S.Ct. at 1162. The *Allen* Court stressed that the burden of proving the chargeable percentage rests fairly with the union inasmuch as the union, and not the employee, possesses the relevant facts and records. *Id.* at 122, 83 S.Ct. at 1163. Lastly, in framing relief, the Court suggested that the union reduce future service fees from objectors by the amount of the past rebate and encouraged the union to adopt an "internal union remedy" to handle objections in years to come. *Id.*

Subsequently, in the *Abood* decision, the Court stated that the statutory protections for objectors available under the RLA were also required by the first and fourteenth amendment protections of freedom of speech and association. 431 U.S. at 233–34, 97 S.Ct. at 1798–99. Because the case came to the Court without a properly developed factual record, it had no specific remedy to review. Nevertheless, the court did suggest that a newly adopted internal un-

ion procedure involving rebate calculations made in the first instance by the union officials but ultimately subject to an impartial review might make further judicial proceedings unnecessary. *Id.* at 240–42 & nn. 41 and 45, 97 S.Ct. at 1802–03 & n.n. 41 and 45. In a separate opinion, an argument was proffered that "the Union should not be permitted to exact a service fee from nonmembers without first establishing a procedure which will avoid the risk that their funds will be used, even temporarily, to finance ideological activities unrelated to collective bargaining." *Id.* at 244, 97 S.Ct. at 1804 (Stevens, J., concurring).

In the most recent RLA case, the Court held that a pure rebate scheme, first suggested in *Street*, "reduces but does not eliminate the statutory violation" where a portion of a service fee is used by the union for impermissible purposes. *Ellis,* 466 U.S. at 443–44, 104 S.Ct. at 1889–90. The Court analogized the pure rebate procedure to "an involuntary loan for purposes to which the employee objects." *Id.* at 444, 104 S.Ct. at 1889. The administrative convenience of such a procedure could not justify the statutory infringement given the availability of alternatives such as the "advance reduction of dues and/or interest bearing escrow accounts, that place only the slightest additional burden, if any, on the union." *Id.*

Finally, in *Chicago Teachers Union v. Hudson,* — U.S. ——, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986), the Supreme Court solidified the constitutional requirements for union procedures in an agency shop. At the outset, the Court stated that procedural safeguards are necessary for two reasons:

First, although the government interest in labor peace is strong enough to support an "agency shop" notwithstanding its limited infringement on nonunion employees' constitutional rights, the fact that those rights are protected by the First Amendment requires that the procedure be carefully tailored to minimize the infringement. Second, the nonunion employee—the individual whose first amendment rights are being affected—

must have a fair opportunity to identify the impact of the governmental action on his interests and to assert a meritorious First Amendment claim.

*Id.* at ——, 106 S.Ct. at 1074, 89 L.Ed.2d at 244–45 (footnotes omitted). Given the important nature of the objecting employees' first amendment interests, the Court reaffirmed the need to assure that a dissenter's service fee is not used, even temporarily, for objectionable ideological causes not germane to the union's statutory function, and identified three additional constitutional requirements for a union's procedures for the collection of service fees. *Id.* at ——–——, 106 S.Ct. at 1075–78, 89 L.Ed.2d at 246–49.

The first additional requirement is that nonmembers must be given adequate information about the basis for the service fee calculation sufficient to enable them to assess the propriety of the calculation prior to the time for objection. The Court indicated that an adequate disclosure must identify and presumably justify the *chargeable* expenditures, rather than merely acknowledge nonchargeable expenditures and thereby treat the balance as chargeable by implication. *Id.* at ——–——, 106 S.Ct. at 1075–76, 89 L.Ed.2d at 246–47.

The second additional constitutional requirement is that the union procedure must "provide for a reasonably prompt decision by an impartial decisionmaker." *Id.* at ——, 106 S.Ct. at 1076, 89 L.Ed.2d at 247. While the Court acknowledged that as recently as *Abood* it had "suggested the desirability of an internal union remedy," *id.* n. 19, it was highly critical of the internal procedure of the Chicago Teachers' Union because the three steps of that procedure were entirely controlled by the union. *Id.* at ——, 106 S.Ct. at 1077, 89 L.Ed.2d at 248. The Court indicated that swift state judicial review of objections in the first instance was certainly one way to satisfy the constitutional requirement, but not the only way. *Id.* n. 20. A less burdensome method might be "expeditious arbitration ... so long as the arbitrator's selection did

not represent the union's unrestricted choice." *Id.* n. 21.

Finally, the Court addressed the union's self-imposed escrow of 100% of the objectors' service fees. While such an escrow eliminates the danger that a dissenter's funds might be temporarily used for objectional purposes, it alone does not render the procedure constitutional. The union must still provide an adequate explanation for the advance reduction of the service fee *and* provide for a reasonably prompt review by an impartial decisionmaker. *Id.* at ————, 106 S.Ct. at 1077–78, 89 L.Ed.2d at 248–49. The Court recognized that a compelled 100% escrow would deprive the union of immediate access to some funds to which it was "unquestionably entitled." *Id.* at ——, 106 S.Ct. at 1078, 89 L.Ed.2d at 249. Therefore, the Court stated that if the initial disclosure sufficiently identifies categories of expenditures that are clearly chargeable, fees proportional to those expenditures would not need to be escrowed. However, it held that both the identified chargeable expenditures and the limited escrow figure itself would have to be verified by an independent audit of a certified public accountant. *Id.* at —— & n. 23, 106 S.Ct. at 1078 & n. 23, 89 L.Ed.2d at 249 & n. 23. The Court's Opinion did not further explain this verification requirement. I must assume that it did not intend that the union's preliminary figures would have to be justifiable under generally accepted accounting principles. Such a requirement would be extraordinary given the Court's longstanding adherence to the *Allen* admonition that "[a]bsolute precision in the calculation ... is not, of course, to be expected or required." 373 U.S. at 122, 83 S.Ct. at 1163 (*cited in Hudson,* at ——, 106 S.Ct. at 1076 n. 18, 89 L.Ed.2d at 247 n. 18).

### 2. Analysis

(a) Michigan Education Association and Ferris Faculty Association–MEA–NEA

■ The policies and procedures effective in 1982 for challenging the service fee calculations of the MEA and FFA are set forth in footnote 4, *supra.* In hindsight, it appears that these procedures were defective under the newly-announced *Hudson* analysis in many respects. Initially, the procedure offers no assurance that a dissenter's funds will not be temporarily used for an objectionable purpose. Secondly, an adequate disclosure of the basis for the reduced fee calculation was not made by the union prior to the time for objections. Further, after nonmembers requested such information, they were only given a copy of the approved budget for the year in question—this also constitutes inadequate information. Finally, the procedure did not provide a reasonably prompt decision by an impartial decisionmaker. Instead, the objector was forced to proceed through two levels of internal union review. This review seems pointless in a case where a nonmember objects to the use of his service fee for *any* nongermane ideological or political purpose. Presumably the union has already decided what is and is not germane in computing the reduced fee. The final step of the procedure was "appropriate proceedings" in the Michigan Employment Relations Commission (MERC). However, while the *Hudson* Court stated that swift *judicial* review would suffice, "review" must logically be synonomous with "decision." In the instant case, the MERC Administrative Law Judge did not render her decision on related challenges to the MEA 1981–1982 reduced fee calculation until this year, just months shy of the instant opinion. While the federal court is certainly in no position to cast aspersions on the speed of MERC's decisionmaking process, this cannot be an example of the swift judicial review the Supreme Court had in mind.

I also have my doubts about the sufficiency of the revised MEA policies and procedures adopted this spring in the wake of the *Hudson* decision. *See* note 7, *supra.* First of all, the information disclosure is scheduled to be made by November 10, "or as soon thereafter as possible." Yet objections must be made on or before December 1. In the spirit of *Hudson,* I think it constitutionally required that nonmembers

have *at least* two weeks after receipt of "adequate information about the basis for the proportionate share" in which to consider the information and make a reasoned decision whether to object. Furthermore, in order to assure that a dissenter's funds are not temporarily used for objectionable purposes, I hold alternatively that Ferris may not withhold agency funds from nonmembers' checks until after the time for objection has passed *or* that the union must place said funds in an independently controlled, interest bearing escrow account for said time period. As to the adequacy of the information disclosed, I cannot judge what I have not seen. I can only say that it will have to be a good deal more revealing than the evidence submitted at trial.

Assuming the preceding requirements are satisfied, the union must either deposit 100% of objectors' service fees into an independently controlled, interest bearing escrow account until such time as an impartial decisionmaker has rendered his final decision on the validity of the reduced fee calculation, *or* have their data for its reduced fee calculation and the data on which it bases its limited escrow verified by an independent audit by a certified public accountant. As a practical matter, I assume that such an audit would require some contemporaneous records detailing the activities on which MEA staffers spend their time. I would hope that such record keeping would not be so administratively burdensome as to compel the union to forego the service fees to which it is entitled. Certainly only major or substantial activities need be listed for purposes of satisfying the *Allen* accuracy requirements. In any event, since the union does not, according to the testimony received at trial, currently keep such time records, the 100% escrow option will likely be necessary for the time being.

Further, the court will need some assurance that the procedure provides for a reasonably prompt decision by an impartial decisionmaker. Even assuming that the union could secure MERC review of the reduced fee calculation on its own behalf and in the absence of a charging party, I hold that any decision that is not handed down before the end of the relevant fiscal year or soon thereafter is not "reasonably prompt." For these reasons, the union might be wise to secure an independent arbitrator, neutrally selected from a state-approved list of labor arbitrators. The MERC proceedings could then be more appropriately used in challenges to the final reduced fee amount after the relevant fiscal year when information on final expenditures for that year is available.

Finally, the MEA's revised policy and procedure differs from the original policy and procedure in note 4, *supra*, in that it does not, by its own terms, apply to amounts retained by local affiliates such as the FFA. This may be an oversight, or it may be intentional. If it is intentional, the FFA must promulgate its own policy and procedure for handling objections to the reduced fee calculation that satisfies the constitutional requirements announced in *Hudson*.

### (b) National Education Association

The NEA rebate procedure is also deficient under *Hudson* in several respects. This procedure is contained in plaintiffs' exhibit 1 and is discussed in note 5, *supra*. The most obvious flaw is that the method for determining the reduced fee or "rebate" amount is based upon an acknowledgement of nonchargeable, political activity rather than a justification of the chargeable activity and expenditures. If the information disclosed is otherwise adequate, the NEA's procedure for making that disclosure, set forth in § III of exhibit 1, is sufficient to pass constitutional muster. I would again require, however, that the NEA either forego collection of service fees from nonmembers until the objection time has passed or deposit such funds into an independently controlled, interest bearing escrow account for said time.

Furthermore, the NEA procedure does not provide for a reasonably prompt decision on the validity of the reduced fee calculation by an independent decisionmaker. In fact, no challenge is allowed under

the procedure until after the end of the relevant fiscal year when the "final political activity rebate" figure is determined based on actual expenditures. As in *Hudson*, even a 100% escrow of the service fee will not justify this delay. The NEA must provide for an opportunity to challenge the advance reduction of dues, under the preliminary calculation, during the fiscal year in question. Once again, *Hudson* requires that anything short of a 100% escrow during this time must be independently verified by an audit of a certified public accountant.

I also hold that the NEA's requirement that the independent arbitrator be bound by the union's definition of "political activity" contravenes constitutional requirements. The independent decisionmaker must be free to apply differing standards of chargeability as required by current law. The union cannot bind that decisionmaker to its own definition or standards in any way.

Finally, I note that § VII.E. of exhibit 1 provides that a nonmember employee who challenges the reduced fee calculations of both the NEA and a state affiliate such as the MEA may request that both challenges be processed by the state affiliate under its procedure. By the terms of this section, the NEA retains the discretion to affirm or deny such a request. Assuming that the state affiliate's procedure meets the *Hudson* requirements, granting such a request would certainly satisfy the NEA's burden of providing constitutionally sufficient challenging procedures.

*C. Remedy*

In accordance with the foregoing discussion in part II.A. of this opinion and the relevant findings of fact, I hold that the union defendants are entitled to the following amounts from plaintiffs James P. Lehnert, Elmer S. Junker, James E. Lindsey, Sam C. Peticolas and John R. Schauble, for agency shop service fees for 1981–1982, together with any interest earned on said amounts: FFA, $20.99; MEA, $7.18, NEA, $1.32. Said plaintiffs are entitled to resti-

tution of the remainder of the reduced fee for 1981–1982 that is currently in escrow, in the amount of $186.41, together with any interest earned on said amount.

This judgment applies only to the service fee for the 1981–1982 fiscal year. The parties, however, filed a stipulation with the court on August 1, 1986, which details a mutually acceptable mechanism for determining the service fees due to the unions from plaintiffs for the four fiscal years subsequent to 1981–1982. This mechanism is based on the final chargeable percentages determined by the court in this case. In review, those percentages are: FFA, 81%; MEA, 3.4%; NEA, 2.75%.

In accordance with the foregoing discussion in part II.B. of this opinion and the relevant findings of fact, I hold that the procedures established by the union defendants for calculating the appropriate agency shop service fee for 1981–1982, and the procedures for challenging the calculation, were constitutionally inadequate under the newly announced *Hudson* standard. However, I find that plaintiffs were not damaged by these procedures, either in 1981–1982 or years subsequent, to any greater extent than the amount of the wrongfully assessed service fee.

Plaintiffs are required by law to contribute to the unions an agency shop service fee of whatever amount the unions can legally establish is chargeable. That amount has been determined by the court for 1981–1982 and the parties have stipulated to a method for calculating that amount for the four subsequent fiscal years. The "retroactive injunction" requested by plaintiffs based on the procedural inadequacies would effectively relieve them of their legal obligation to contribute to the support of the recognized exclusive representative. Such a "retroactive injunction" would not, in my opinion, redress the nature of the theoretical injury, to wit: the denial of the plaintiffs' first amendment interests in proper procedures. Therefore, this type of equitable relief would be inappropriate.

To the extent that plaintiffs have been injured, they are entitled to and will receive adequate compensatory damages. Plaintiffs are not entitled to damages for the value or importance of their first amendment interests in proper procedures as a supplement to compensatory damages. *Memphis Community School District v. Stachura*, — U.S. —, — – —, 106 S.Ct. 2537, 2545–46, 91 L.Ed.2d 249, 261–62 (1986).

Of course, plaintiffs are entitled to a prospective injunction restraining the nonunion defendants from deducting any service fees from their paychecks until such time as the union defendants establish that they have adopted procedures that comply with the requirements of *Hudson*. These requirements are adequately explained above. With respect to the MEA and FFA, some amendment of their revised policies and procedures set forth in note 7, *supra*, is probably required. As to the NEA, significant amendment to their procedure contained in plaintiffs' exhibit 1 is required to bring it into compliance with the constitutional standard. As a partial alternative, the NEA may establish by affidavit or otherwise that future objections by plaintiffs will be processed through constitutional procedures adopted by the MEA. The court will retain jurisdiction in this case for the sole purpose of determining if and when the union defendants have adopted constitutional procedures. At that time, the court's injunction will be dissolved.

## JUDGMENT ORDER

In accordance with the written opinion filed this date, and for the reasons stated therein;

IT IS HEREBY ORDERED that judgment shall enter in favor of each of the following plaintiffs, James P. Lehnert, Elmer S. Junker, James E. Lindsey, Sam C. Peticolas and John R. Schauble in the amount of $186.41, together with any interest accrued on this amount. This judgment shall be satisfied out of the escrow account established by the parties.

IT IS FURTHER ORDERED that the union defendants are entitled to the following amounts from each of said plaintiffs in satisfaction of plaintiffs' service fee obligations for the 1981–1982 fiscal year: FFA, $20.09; MEA, $7.18; NEA, $1.32, together with any interest accrued on these amounts.

IT IS FURTHER ORDERED that plaintiffs' service fee obligations for the four fiscal years subsequent to 1981–1982 shall be calculated in accordance with the stipulation filed with the court on August 1, 1986.

IT IS FURTHER ORDERED that the nonunion defendants are enjoined from deducting any future service fees from plaintiffs' salaries until further order of the court.

## APPENDIX A

Direct Costs

| | |
|---|---:|
| Bargaining team salaries | $2,500.00 |
| Bargaining team expenses | 249.45 |
| Bargaining team benefits | 72.79 |
| Bargaining—secretarial | 28.88 |
| Bargaining—miscellaneous | 86.79 |
| Contract ratification expenses | 112.15 |
| Negotiations training workshop | 687.02 |
| Arbitration fees | 1,051.69 |
| Crisis Center/Strike Headquarters* | |
| — rent | 2,780.00 |
| — insurance | 91.00 |
| — utilities | 80.22 |
| — telephone | 632.45 |
| — equipment | 40.12 |
| — petty cash fund | 197.25 |
| Picketing—food | 219.05 |

Direct Costs

| | |
|---|---|
| Picketing—mailing | $26.60 |
| Newspaper & radio advertising | 446.10 |
| Signs, posters, buttons | 141.21 |
| Rent—membership meetings | 150.00 |
| Loan to another association | 2,500.00 |
| Lobbying state legislature | 55.89 |
| MEA legislative dinner | 46.80 |
| Preserve Public Education Conference | 149.99 |
| 13E Coordinating Council | 666.42 |
| MEA Representative Assembly | 490.45 |
| NEA Representative Assembly | 536.39 |
| Sub-total | 14,038.71 |

Administrative

| | |
|---|---|
| Computer | 4,137.15 |
| Supplies | 43.34 |
| Mailing Permit | 69.97 |
| Executive Board expenses | 44.46 |
| Photocopying | 3.60 |
| Sub-total | 4,298.52 |
| Total FFA Expenditures 1981–1982 | $18,337.23 |

* Plaintiffs and defendant unions disagree as to the use of this headquarters. Plaintiffs maintain that it was used to prepare for a possible strike, but defendant unions contend that it was a "Crisis Center."

## APPENDIX B

### Analysis Summary of Teachers' Voice
### Volume 59

| Category | Column Inches Total | Column Inches Chargeable |
|---|---|---|
| Collective Bargaining | 779 | 779 |
| Lobbying | 1895.5 | 1816 |
| Electoral Politics | 1167 | 847.5 |
| Ideological | 508.5 | 0 |
| Public Relations | 405 | 405 |
| Litigation | 97 | 79 |
| Strikes | 143.5 | 0 |
| Administrative | 637.5 | 627 |
| Newsletter Basics | — | proportional |
| Other Material | 1977 | 1657.5 |
| TOTAL | 7610 | 6211 |

$$\frac{6211}{7610} = 81.6\%$$